USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT   ____________________ No. 95-1586 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. GARY S. GILBERG, Defendant, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________  ____________________ Selya, Cyr and Stahl, Circuit Judges. ______________  ____________________ Gary C. Crossen, with whom Toni G. Wolfman, Mark D. Rosen, Cindy _______________ _______________ ______________ _____ M. Lott and Foley, Hoag & Eliot were on brief for appellant. _______ ___________________ Wan J. Kim, Attorney, Department of Justice, with whom Donald K. __________ __________ Stern, United States Attorney, Mark D. Seltzer, Acting Director, New _____ _______________ England Bank Fraud Task Force, and James P. Gillis, Trial Attorney, ________________ New England Bank Fraud Task Force, were on brief for appellee.  ____________________ January 31, 1996   ____________________ CYR, Circuit Judge. Defendant Gary S. Gilberg chal- CYR, Circuit Judge.  _____________ lenges several district court rulings relating to his trial and sentencing for conspiring to make, and making, false statements to financial institutions in order to procure mortgage loan financing, see 18 U.S.C. 371 & 1014. We affirm all but the ___ restitutionary sentence.  I I BACKGROUND BACKGROUND __________ During the 1980s, after borrowing almost $5 million which he agreed to repay from future condominium sale proceeds, Gilberg launched Chancery Court, a forty-unit condominium project in Lynn, Massachusetts. Condominium sales did not proceed apace, however, and Gilberg decided to lure prospective buyers by promising to obtain 100% mortgage financing for them, obviating the need for down payments. To this end, Gilberg would inflate the purchase price stated on the sales agreement which he submit- ted to the bank in support of the buyer's mortgage loan applica- tion. A so-called "amended" sales agreement, containing the true purchase price, would be retained in Gilberg's private files, and the buyer was told not to mention the "amendment" to the bank. On other occasions, Gilberg provided prospective buyers with second mortgage financing, which he concealed from the first- mortgage lenders by instructing his attorney not to record the second mortgages, or to record them late. Gilberg attended each loan closing, personally signing HUD-1 settlement statements which he knew to contain false information. These means enabled 2 Gilberg to sell thirty-seven condominium units, which were financed through various banks. In August 1993, Gilberg was indicted in one count for conspiring to make false statements on twenty-one loan applica- tions to three FDIC-insured financial institutions, see 18 U.S.C. ___ 371, and in thirteen counts for making false statements to FDIC-insured institutions, see id. 1014. Several condominium ___ ___ buyers, as well as Gilberg's attorney, testified that Gilberg originated and orchestrated the scheme. The jury convicted on all counts and the district court sentenced Gilberg to thirty-six months' imprisonment and ordered $3,635,000 in restitution. II II DISCUSSION DISCUSSION __________ A. The Trial Related Rulings A. The Trial Related Rulings _________________________ 1. "Good faith" Jury Instruction 1. "Good faith" Jury Instruction ____________________________ Gilberg first contends that the final jury instruction misdefined the mens rea element in 18 U.S.C. 1014, which ____ ___ criminalizes "knowingly mak[ing] any false statement or report . _________ . . for the purpose of influencing in any way the action of . . . ___ ___ _______ __ ___________ any [FDIC-insured bank] . . . upon any application, advance, . . . commitment, or loan." (Emphasis added.) Gilberg argues that section 1014 affords a "good faith" defense where the defendant knew the statement or report contained false information but acted without the "bad" purpose to influence the bank's actions. He proffered evidence that he knew and believed, at the time of the various loan applications, that the prevailing banking 3 practice was to approve or disapprove applications based solely ______ on the appraised value of the real property securing the loan, rather than on whether the real estate sale itself involved price "discounts" or secondary mortgage financing. Thus, Gilberg argues, the district court hobbled his defense by instructing the jury that "a defendant does not act in good faith even if he honestly holds a particular opinion or belief and, yet, knowingly makes false and fraudulent statements or misrepresentations."  Gilberg concededly raised no objection to the jury instruction. See Fed. R. Crim. P. 51. Consequently, we review ___ for plain error, see Fed. R. Crim. P. 52(b), and may reverse only ___ if (i) the final jury instruction constituted error (ii) which was or should have been "obvious" in the sense that the governing law was clearly settled to the contrary, and (iii) appellant proves that the error resulted in "prejudice," or in other words, that it affected his substantial rights. See United States v. ___ ______________ Hurley, 63 F.3d 1, 9 (1st Cir. 1995) (citing United States v. ______ ______________ Olano, 113 S. Ct. 1770, 1777 (1993)). Even if these three _____ criteria are met, however, we do not "notice the error unless it caused `a miscarriage of justice' or [seriously] undermined `the integrity or public reputation of judicial proceedings.'" Id. ___ (citations omitted). Though the statutory interpretation posited by Gilberg is dubious at best, cf., e.g., United States v. Wilcox, 919 F.2d ___ ___ _____________ ______ 109, 112 (9th Cir. 1990) ("The requisite intent [under 1014] is the intent to influence an action, and nothing more."), we do not 4 reach the merits. Gilberg cites to no authority let alone to a controlling United States Supreme Court or First Circuit decision clearly holding that the "good faith" instruction given below contained an erroneous statement of the mens rea ____ ___ requirement under section 1014. See Olano, 113 S. Ct. at 1777 ___ _____ ("At a minimum, the Court of Appeals cannot correct an error __ _ _______ pursuant to Rule 52(b) unless the error is clear under current law.") (emphasis added).1 Hence, any error in the challenged instruction was neither "obvious," nor cognizable under Criminal Rule 52(b).  2. Motion in Limine  2. Motion in Limine ________________ Gilberg next assigns error in the district court order precluding evidence that the defrauded banks had relied exclu- sively on property appraisals in determining whether to approve loan applications, and not on the apparent absence of "discounts" and second mortgage financing. He claims that this ruling prejudiced him because the excluded evidence would have bolstered his "good faith" defense. See supra Section II.A.1.2 ___ _____  ____________________ 1Morissette v. United States, 342 U.S. 246 (1952), and Cheek __________ _____________ _____ v. United States, 498 U.S. 192 (1991), are inapposite. Even if _____________ Gilberg's interpretation of the "purpose" clause in 1014 were correct, he cannot seriously contend that the one clear mens rea ____ ___ element in 1014 "knowingly" communicating false statements _____ does not criminalize conduct a normal person readily would recognize as culpable.  2We do not understand Gilberg to argue that the excluded evidence was relevant to the discredited "complicity" defense, namely, that any bank officials' knowing participation in the scheme would exonerate Gilberg under 1014. See United States ___ _____________ v. Johnson, 585 F.2d 119, 124 (5th Cir. 1978) (rejecting complic- _______ ity defense, and noting that the "[t]he savings and loan's awareness of the fraud is not relevant, for its existence is not 5 Once again we review for plain error, since Gilberg first raised this claim on appeal. See Hurley, 63 F.3d at 9. As ___ ______ there was no plain error in rejecting the "good faith" defense instruction, a fortiori there can have been no plain error in _ ________ excluding evidence offered in support. Furthermore, given Gilberg's concession that a representative sampling of this "good faith" evidence was admitted at trial, he has failed to demon- strate "prejudice." Olano, 113 S. Ct. at 1778 (noting that, _____ unlike Rule 52(a), Rule 52(b) provides that "the defendant rather _________ than the Government . . . bears the burden of persuasion with respect to prejudice") (emphasis added).  B. The Sentencing Rulings B. The Sentencing Rulings ______________________ 1. Amount of Loss (U.S.S.G. 2F1.1) 1. Amount of Loss (U.S.S.G. 2F1.1) ________________________________ Gilberg contends that the district court committed three errors in calculating the amount of loss under the then- applicable version of U.S.S.G. 2F1.1, and that the combined effect of its miscalculations ballooned the total loss from $1-2 million to the $2-5 million range, which in turn led the court to make a ten-level (rather than a nine-level) upward adjustment in  ____________________ inconsistent with the intent to influence which a violator of  1014 must possess"). Nor do we understand Gilberg to argue for the similarly discredited "lack of reliance" defense, namely, that his purpose to influence was immaterial because the banks __________ did not, in the end, actually rely on his false statements in approving the loan applications. See United States v. Norberg, ___ _____________ _______ 612 F.2d 1, 4 (1st Cir. 1979) (expressly rejecting such a de- fense). 6 his base offense level of six.3  First, Gilberg argues that the loss calculation should not have included $726,637 in accrued mortgage loan interest. See U.S.S.G. 2F1.1, comment. (n.7) (excluding from the loss ___ calculation the "interest the victim could have earned"); United ______ States v. Hoyle, 33 F.3d 415, 419 (4th Cir. 1994). But the ______ _____ settled law in this circuit is to the contrary. See United ___ ______ States v. Goodchild, 25 F.3d 55, 66-67 (1st Cir. 1994) (holding ______ _________ that accrued finance charges on credit cards are not lost "oppor- tunity costs," and may be included in amount of loss) (citing United States v. Lowder, 5 F.3d 467, 471 (10th Cir. 1993)). ______________ ______ Gilberg's attempt to distinguish Goodchild is unavailing. As the _________ Goodchild panel's citation to Lowder and other authority makes _________ ______ clear, we have found no principled difference between interest earned on a credit card (a/k/a "finance charges") and interest _____ earned on other types of loans. See Hurley, 63 F.3d at 9 (noting ___ ______ that newly-constituted panels are bound by a prior panel decision on point). Since it was proper to include the $726,637 in interest as part of the loss, the other loss calculation errors raised on appeal need not be addressed because the unimpeachable loss totalled no less than $2,669,065, well within the $2-5 million range necessary to trigger a ten-level upward adjustment.  ____________________ 3Although normally a loss determination under U.S.S.G.  2F1.1 is fact-based and subject to clear error review, see United ___ ______ States v. Goodchild, 25 F.3d 55, 64 (1st Cir. 1994), Gilberg ______ _________ challenges the district court's interpretation of a sentencing guideline. Therefore, review is de novo. See id.; see also __ ____ ___ ___ ___ ____ United States v. Ovalle-Marquez, 36 F.3d 212, 221 (1st Cir. ______________ ______________ 1994), cert. denied, 115 S. Ct. 1322 (1995).  _____ ______ 7 2. The "Role in Offense" Enhancement 2. The "Role in Offense" Enhancement _________________________________ Gilberg challenges the four-level upward adjustment based on his role in the offense, see U.S.S.G. 3B1.1, contend- ___ ing that the government improperly singled him out for prosecu- tion by cutting deals with the real "leaders" of the Chancery Court scheme his attorney and a business partner. Second, he complains that the district court failed to make express findings of fact regarding the comparative responsibilities of the partic- ___________ ________________ ipants in the scheme. We review for "clear error," see United ___ ______ States v. Akitoye, 923 F.2d 221, 227 (1st Cir. 1991), mindful ______ _______ that "battles over a defendant's [role in the offense] . . . will almost always be won or lost in the district court," United ______ States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995). Gilberg's ______ ________ case is no exception.  Gilberg concedes that the evidence could support a rational inference that he orchestrated the criminal conduct alleged in the indictment. The evidence disclosed that he was a sophisticated real estate developer who supplied false purchase prices to his attorney, instructed his attorney and prospective buyers to conceal his false statements, and secreted the documen- tation containing the actual terms. Gilberg cites no authority nor is there any for the proposition that a sentencing court must compare the responsibilities of all participants _______ before imposing a U.S.S.G. 3B1.1 enhancement against a defen- dant. Moreover, in crediting the evidence that Gilberg played 8 the pivotal role in the initial success of the Chancery Court scheme, the district court implicitly found that Gilberg was an "organizer," regardless of the precise roles played by each cohort. See U.S.S.G. 3B1.1, comment. (n.4) (noting that an ___ offense may involve "more than one person who qualifies as a leader or organizer"); United States v. Tejeda-Beltran, 50 F.3d _____________ ______________ 105, 111-13 (1st Cir. 1995) ("We hold that retention of control over other participants, although sometimes relevant to an inquiry into the status of a putative organizer, is not an essential attribute of organizer status."); cf. U.S.S.G. 3B1.1, __ comment. (n.2) (authorizing upward departure for "management responsibility over the property, assets, or activities of a criminal organization," even though defendant neither led nor supervised any other participant). 3. The Victim and Wit- 3. The Victim and Wit- ____________________ ness Protection Act ness Protection Act ___________________ Finally, Gilberg claims that the restitutionary sen- tence overstates victim loss because the class of "victims" is too broad. He points out that the sentencing court ordered restitution in connection with all thirty-one loans, whereas the indictment charged him in relation to only twenty-one loans.  The government concedes that the last criminal conduct involving Gilberg took place no later than June 1990. The Victim and Witness Protection Act ("VWPA"), 18 U.S.C. 3663-3664 (1990), governs restitution in criminal cases. See, e.g., United ___ ____ ______ States v. DeSalvo, 41 F.3d 505, 511 (9th Cir. 1994). In June ______ _______ 1990, the VWPA provided that the district court in sentencing 9 "a defendant convicted of an offense" may order "restitution _________ __ __ _______ to any victim of such offense." 18 U.S.C. 3579(a)(1)(1982) ______ __ ____ _______ (emphasis added); see 18 U.S.C. 3579-3780 (1987), amended by ___ _______ __ 18 U.S.C. 3663-3664 (1990). In Hughey v. United States, 495 ______ _____________ U.S. 411 (1990), the defendant had been charged, in multiple counts, with theft and unauthorized use of credit cards, offenses which caused victim losses totaling $90,431. Although Hughey pled guilty to but one count of unauthorized use of a single ______ credit card, which caused $10,412 in victim loss, id. at 414, the __ district court ordered $90,431 in restitution. Reversing, the Supreme Court held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the ____ ________ _______ basis of the offense of conviction." Id. at 413, 422 n.5.  _____ __ ___ _______ __ __________ ___ Effective November 29, 1990, Congress broadened the VWPA definition of "victim," see Pub. L. No. 101-647, 2509, 104 ___ Stat. 4789, 4863, 4931 (Nov. 29, 1990) (Crime Control Act of 1990) (codified at 18 U.S.C. 3663(a)(2)), thereby effectively overruling Hughey in part. Section 3663(a)(2) now provides that ______ "a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person __________ ___ ______ directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. 3663(a)(2) (emphasis added). See generally United States v. Neal, 36 F.3d ___ _________ _____________ ____ 1190, 1200 (1st Cir. 1994).  The district court ordered Gilberg to make restitution 10 to banks other than the three FDIC-insured banks involved in the _____ ____ ____________ twenty-one insured loans which formed the entire basis for the conspiracy and the substantive counts upon which Gilberg was convicted. The parties agree that, under the 1987 version of the ____ VWPA as interpreted in Hughey, the restitution order imposed on ______ Gilberg would be improper, and that "approximately $2 million" would be the maximum permissible "victim loss" calculation.  The government nonetheless contends that the district court order complies with the 1990 VWPA. See Hughey, 495 U.S. at ____ ___ ______ 413 n.1 (normally, the VWPA version in effect at sentencing __________ controls). Gilberg responds that such a retroactive application of section 3663(a)(2) to his pre-November 1990 criminal conduct would violate the Ex Post Facto Clause, U.S. Const. art. I, 9, __ ____ _____ cl. 3. See Miller v. Florida, 482 U.S. 423, 430-31 (1987); see ___ ______ _______ ___ also United States v. Newman, 49 F.3d 1, 10-11 (1st Cir. 1995); ____ _____________ ______ United States v. Cronin, 990 F.2d 663, 666 (1st Cir. 1993).  _____________ ______ Normally, we review restitution orders only for "abuse of discretion." See United States v. Benjamin, 30 F.3d 196, 198 ___ _____________ ________ (1st Cir. 1994); United States v. Savoie, 985 F.2d 612, 617 (1st _____________ ______ Cir. 1993). Although a timely challenge to a retroactive appli- cation of the 1990 VWPA amendments would present a question of ____ law subject to plenary review, see, e.g., United States v. ___ ____ ______________ Guthrie, 64 F.3d 1510, 1514 (10th Cir. 1995); DeSalvo, 41 F.3d at _______ _______ 511; United States v. Meacham, 27 F.3d 214, 218 (6th Cir. 1994), _____________ _______ Gilberg concedes that he did not object at sentencing. Accord- ingly, we review only for plain error. See United States v. ___ ______________ 11 Tutiven, 40 F.3d 1, 7-8 (1st Cir. 1994), cert. denied, 115 S. Ct. _______ _____ ______ 1391 (1995); United States v. Rodriguez, 938 F.2d 319, 321 (1st ______________ _________ Cir. 1991). As the Rule 52(b) "plain error" test announced in Olano, 113 S. Ct. at 1776-79, applies to sentencing errors, see _____ ___ Benjamin, 30 F.3d at 197; supra Section II.A.1, we apply the ________ _____ Olano "plain error" criteria to the forfeited "victim loss" _____ calculation claim asserted by Gilberg on appeal.4 a) "Error" a) "Error" _____ The first Olano criterion that there be "error," _____ Olano, 113 S. Ct. at 1777 is readily met here. Retroactive _____ application of VWPA 3663(a)(2) would violate the Ex Post Facto __ ____ _____ Clause, since it would "make[] more burdensome the punishment for __________ ___ [Gilberg's] crime[s], after [their] commission . . . ." Dobbert _________ ________ _____ _____ __________ _______ v. Florida, 432 U.S. 282, 292 (1977) (emphasis added); see also _______ ___ ____ United States v. Johnson, 952 F.2d 565, 585 (1st Cir. 1991), ______________ _______ cert. denied, 113 S. Ct. 58 (1992). As an order of restitution _____ ______ is part of the criminal sentence, we reject the suggestion that the November 1990 VWPA amendments may be applied against Gilberg. See, e.g., United States v. Jewett, 978 F.2d 248, 252-53 (6th ___ ____ _____________ ______ Cir. 1992) (rejecting retroactivity argument); see also United ___ ____ ______ States v. Elliott, 62 F.3d 1304, 1313-14 (11th Cir. 1995) (same); ______ _______ DeSalvo, 41 F.3d at 515 (same). _______  ____________________ 4Given the concession by the government that application of Hughey would result in a $1.6 million reduction in the restitu- ______ tion order, we conclude that Gilberg has shouldered his burden on the third Olano factor "prejudice." See supra Section II.A.1. _____ ___ _____ We therefore confine our "plain error" analysis to the three remaining Olano factors (i.e., error, "obviousness," and "mani- _____ fest miscarriage of justice").  12 b) Obviousness of Error  b) Obviousness of Error ____________________ The government argues that retroactive application of the 1990 VWPA amendments would not constitute "obvious" error, see Olano, 113 S. Ct. at 1777, because this court had yet to ___ _____ weigh in on the retroactivity question by the time Gilberg was __ ___ ____ _______ ___ sentenced, and other courts of appeals were divided. Compare _________ _______ Jewett, 978 F.2d at 252-53, with United States v. Rice, 954 F.2d ______ ____ _____________ ____ 40 (2d Cir. 1992); United States v. Arnold, 947 F.2d 1236 (5th _____________ ______ Cir. 1991) (per curiam). We disagree. The Rice and Arnold cases are factually and legally ____ ______ inapposite to the present context. The retroactivity issue in Rice ultimately turned on a different 1990 VWPA amendment not ____ _________ ___ implicated in our case which provided that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. 3663(a)(3) ____ _________ (emphasis added). The plea agreement in Rice expressly provided ____ _________ for restitution both to victims of the dismissed counts and victims of uncharged criminal conduct, Rice, 954 F.2d at 41-42, ____ and the plea predated both the 1990 VWPA amendments and Hughey. ____ ____ ___ ______ Thus, settled Second Circuit precedent supported the expansive victim loss calculation agreed to by Rice. Id. at 44. The ___ Second Circuit rejected Rice's ex post facto argument because (1) __ ____ _____ Rice must have relied on the more onerous Second Circuit case ____ law, rather than on Hughey, when he agreed to the broad restitu- ______ tion commitment adopted in the plea agreement; and (2) section 3663(a)(3) did not retroactively "enhance the punishment for an ___ 13 offense" but "merely provided that a specified type of plea agreement could be enforced from that point on." Id.  ___ The Fifth Circuit employed the same analysis in Arnold, ______ 947 F.2d at 1238 n.2, noting that section 3663(a)(3) was not retroactive but "applied prospectively to validate Arnold's [earlier] plea agreement." The government cites no apposite circuit court authority holding that section 3663(a)(2) applies __________ retroactively to pre-November 1990 criminal conduct. As the government correctly notes, we have yet to address this precise question. In Cronin, 990 F.2d at 663, the ______ government did not contend that section 3663(a)(2) should be applied retroactively to pre-November 1990 conduct, urging ____________ ____ instead that Hughey is distinguishable from cases involving ______ _______________ convictions for "offense[s]" like mail fraud which require, ____ _____ as an essential element, proof of a broader "scheme to defraud." See id. at 666; see also, e.g., 18 U.S.C. 1341. Given the ___ ___ ___ ____ ____ inherent breadth of the "offense" of conviction in Cronin, the ______ government argued that VWPA restitution was not limited to losses caused by the particular mailings designated in the individual __________ ________ counts upon which the defendant was convicted, but included all victim losses occasioned by the larger fraud "scheme." Noting a circuit split on the issue, we sided with the majority rule, and concluded that Hughey barred the broader restitution order. ______ Cronin, 990 F.2d at 666; see also Newman, 49 F.3d at 11 (applying ______ ___ ____ ______ Cronin pronouncement to wire fraud conviction). ______ The implicit concessions of nonretroactivity in Cronin ______ 14 and Newman apparently stemmed from the government's acknowl- ______ edgement that retroactive application of section 3663(a)(2) would have had no colorable basis in the decisional law construing the Ex Post Facto Clause. See id. at 11 n.14 (noting that, "[a]s the __ ____ _____ ___ ___ offenses occurred in 1989 and early 1990, Newman is subject to the restitution statute as it stood prior to amendment in Novem- ber of 1990"). Further, had this court been satisfied that the 1990 VWPA amendments were readily amenable to retroactive appli- cation in Cronin and Newman, we could have affirmed those restit- ______ ______ utionary sentences on that alternative ground. See United States ___ _____________ v. Alzanki, 54 F.3d 994, 1008 (1st Cir. 1995), petition for cert. _______ ________ ___ _____ filed, 64 U.S.L.W. 3298 (U.S. Oct. 16, 1995) (No. 95-619) (appel- _____ late court may affirm district court on any ground supported by record); cf. also Jewett, 978 F.2d at 252 (finding that Hughey ___ ____ ______ ______ precluded broad restitution order, before addressing VWPA retro- activity question, even though the latter issue had not been addressed by parties). Based on the clear language of the 1987 VWPA and the unanimous circuit precedents rejecting the govern- ment's retroactivity claim, see supra Section II.B.3.a, we hold ___ _____ that the error in this case satisfied the "obviousness" test announced in Olano.5 See United States v. Weiner, 3 F.3d 17, 24 _____ ___ _____________ ______  ____________________ 5It is noteworthy that the Olano Court explicitly reserved _____ decision on whether an error that becomes clear after trial, but prior to review by the court of appeals, may be considered "obvious." Olano, 113 S. Ct. at 1777. ("At a minimum, the Court _____ of Appeals cannot correct an error pursuant to Rule 52(b) unless the error is obvious under current law."). As in Olano, we need _____ not resolve this question because we have found, given the unanimous case law, that it was already "obvious" at the time of sentencing that Gilberg should not be held responsible under the __________ 15 n.5 (1st Cir. 1993) (noting that a circuit split may rule out a finding that forfeited error was "obvious," even if First Circuit has not weighed in on issue).  c) "Miscarriage of Justice" c) "Miscarriage of Justice" ______________________ Although Olano entrusts remediation of plain error to _____ the sound discretion of the reviewing court, the courts of appeals "should not" exercise their discretion unless a forfeited error results in "`a miscarriage of justice,' or "`seriously affect[s] the fairness, integrity or public reputation of judi- cial proceedings.'" Olano, 113 S. Ct. at 1776 (citations omit- _____ ted).  In all events, the VWPA expressly limits restitutionary relief to "victims of [the] offense [of conviction]." 18 U.S.C.  _______ 3662(a)(1) (emphasis added). A federal court has no inherent authority to order restitution in a criminal case; it may do so only as expressly provided by statute. DeSalvo, 41 F.3d at 511. _______ We have noted that when the district court fundamentally departs from "obvious" sentencing principles, "the situation corresponds mutatis mutandis to one in which a forfeited error may have _______ ________ caused the conviction of an innocent person, the other rubric ________ ______ under which a plain and prejudicial error should be noticed on appeal." United States v. Whiting, 28 F.3d 1296, 1312 (1st Cir.) _____________ _______ (citing Olano, 113 S. Ct. at 1779) (emphasis added), cert. _____ _____ denied, 115 S. Ct. 378 (1994). Given the particular circum- ______  ____________________ 1987 VWPA for losses occasioned victims of offenses with which he was not charged, nor held retroactively responsible under the 1990 VWPA amendments. See supra Section II.B.3(a), (b).  ___ _____ _ 16 stances of this case, and the substantial $1.6 million reduction in restitution portended by Hughey's application, we find plain ______ error warranting vacatur of the restitutionary sentence in this case.6 The restitution award is reduced to $2,107,406.00, comprising the total estimated loss on the twenty-one mortgage loans designated in the indictment.7 The sentence is modified to require restitution in the ___ ________ __ ________ __ _______ ___________ __ ___ amount of $2,107,406. The district court judgment is affirmed, ______ __ __________ ___ ________ _____ ________ __ _________ as modified.  __ ________  ____________________ 6Gilberg's remaining challenges to the restitution order do not meet the "plain error" standard. First, he argues that the district court erroneously assessed the loss occasioned the lenders by using the price the lender received on resale follow- ________ ing foreclosure, rather than the foreclosure price bid by the ___ lender. This issue has not yet been addressed in the First Circuit. The circuit court decisions cited by Gilberg are inapposite, simply holding that the sentencing court should be wary of basing restitution on the resale price where the lender acquired real estate at foreclosure but does not resell for years. See, e.g., United States v. Holley, 23 F.3d 902, 914 (5th ___ ____ _____________ ______ Cir. 1994) (six years). Here, however, there is no evidence that Gilberg's victims held the property for such extended periods following foreclosure. Consequently, any error in the victim loss calculation, or the standard employed, has not been shown to be "obvious." Second, Gilberg contends that the district court failed to make explicit findings on his ability to pay restitution. See 18 ___ U.S.C. 3664(a). Nevertheless, we have held that such findings need not be explicit. See Newman, 49 F.3d at 10 (citing Savoie, ___ ______ ______ 985 F.2d at 618). Moreover, the district court supportably found that Gilberg's earning potential would enable him to meet his considerable restitutionary obligations in the future. Id. at ___ 10-11.  7Since loss calculations under U.S.S.G. 2F1.1 are based on criteria different from the VWPA victim loss criteria, see, e.g., ___ ____ id. 2B1.3 (providing that "relevant conduct," for guideline ___ sentencing purposes, may encompass conduct not charged in indict- ment, and conduct underlying the counts upon which defendant was acquitted), the reduction in Gilberg's restitutionary sentence requires no readjustment in the offense level. See supra Section ___ _____ II.B.1. 17